# UNITED STATES DISTRICT COURT

### for the
Eastern District of Louisiana



In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  19-mc-14681
ELECTRONIC DEVICES CURRENTLY LOCATED AT THE DRUG ENFORCEMENT )
ADMINISTRATION, 3838 CAUSEWAY BLVD, METAIRIE, LOUISIANA 70002 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____Eastern_____ District of _____Louisiana_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., Section 841(a)(1) | Distribution of a controlled substance |
| Title 21, U.S.C., Section 846 | Conspiracy to distribute narcotics |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____*/s/ SA Ryan Schumacher*_____
*Applicant's signature*

_____Special Agent Ryan Schumacher, DEA_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___December 19, 2019___

_____Janis van Meerveld_____
*Judge's signature*

City and state:  New Orleans, Louisiana

Hon. Janis van Meerveld, United States Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA



IN THE MATTER OF THE SEARCH OF:
    (1) ONE SAMSUNG CELLULAR
        PHONE, DEA CASE NO. GH-19-
        0017, EXHIBIT N-7 ("COLLINS'S
        DEVICE");
    (2) ONE BLACK TCL CELLULAR
        PHONE, DEA CASE NO. GH-19-
        0017, EXHIBIT N-12 (JACKSON'S
        DEVICE #1);
    (3) ONE BLACK APPLE IPHONE, DEA
        CASE NO. GH-19-0017, EXHIBIT N-
        13("JACKSON'S DEVICE #2");
    (4) ONE BLACK COOLPAD
        CELLULAR PHONE, DEA CASE
        NO. GH-19-0017, EXHIBIT N-17
        ("ESPRIT'S DEVICE #1"); and
    (5) ONE BLACK APPLE IPHONE, DEA
        CASE NO. GH-19-0017, EXHIBIT N-
        18 ("ESPRIT'S DEVICE #2).

CURRENTLY LOCATED AT THE DRUG
ENFORCEMENT ADMINISTRATION, 3838
CAUSEWAY BLVD, METAIRIE,
LOUISIANA

Case No. 19-mc-14681

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

    I, Ryan D. Schumacher, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), United States Department of Justice, currently assigned to the DEA, New Orleans Field Division.  I am currently assigned to the DEA New Orleans Field Division ("NOFD"), where I am a member of a multi-agency task force. I have participated in investigations of illegal narcotics trafficking and racketeering offenses, and I am thoroughly familiar with the investigative techniques used in these investigations.  Prior to my assignment at DEA, I was an analyst with TD Bank in New York, New York.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is:

    a.   One Samsung cellular phone, DEA Case GH-19-0017, Exhibit N-7 ("COLLINS's Device");

    b.   One black TCL cellular phone, DEA Case GH-19-0017, Exhibit N-12 ("JACKSON's Device #1");

    c.   One black Apple iPhone, DEA Case GH-19-0017, Exhibit N-13 ("JACKSON's Device #2");

d.  One black Coolpad cellular phone, DEA Case GH-19-0017, Exhibit N-17 ("ESPRIT's Device #1"); and

e.  One black Apple iPhone, DEA Case GH-19-0017, Exhibit N-18 ("ESPRIT's Device #2") (collectively, the "Target Devices")

The Target Devices are currently located at the Drug Enforcement Administration, 3838 Causeway Blvd., Metairie, Louisiana.

5.      The applied-for warrant would authorize the forensic examination of the Target Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      DEA and the Federal Bureau of Investigation ("FBI") have been conducting this investigation for several months.  The investigative techniques utilized during this investigation have included court authorized wiretapping orders, physical surveillance, pole cameras, administrative subpoenas, and other sources.

7.      The investigation has revealed that Sean MARTIN is a narcotics trafficker based in the New Orleans metropolitan area. ESPRIT is MARTIN's son, who also works with MARTIN to sell narcotics, primarily heroin, in New Orleans and allows MARTIN to utilize his residence as a "stash spot." Moreover, this investigation has revealed that Gene JACKSON distributes heroin obtained from MARTIN and that Marvin COLLINS is one of MARTIN's heroin sources of supply. In addition, MARTIN meets with various customers in the New Orleans metropolitan area to whom he provides heroin that he stores at the Target Residence.  In addition, the investigation has revealed that one of MARTIN's associates, Kevin PRICE ("PRICE"), receives cocaine from a source of supply, Larry LABRY ("LABRY"), and the

investigation has revealed that PRICE has attempted to set up a cocaine transaction between LABRY and MARTIN.  Finally, the investigation has revealed that William ROBERTSON ("ROBERTSON") acts as a facilitator for the organization, and that the organization utilizes ROBERTSON's residence, located at 1330 Kerlerec St., New Orleans, Louisiana ("1330 Kerelec. St." or "ROBERTSON's Residence"), in furtherance of their drug trafficking activities.

8.      On October 23, 2019, the Honorable Sarah S. Vance, United States District Judge, Eastern District of Louisiana, issued an order under miscellaneous number 19-MC-12245, authorizing the interception of wire and electronic communications of a telephone assigned number (504) 201-6450 ("MARTIN's Phone"),[1] utilized by MARTIN.  Interceptions pursuant to that order began on October 23, 2019, and ended on November 21, 2019.  Pursuant to that order, my team has intercepted conversations between MARTIN and ESPRIT, who utilizes telephone number (504) 657-4974 ("ESPRIT's Phone"),[2] MARTIN and JACKSON, who utilizes telephone number (504) 621-7577 ("JACKSON's Phone") and COLLINS, who utilizes a telephone assigned number (504) 503-2175 ("COLLINS Phone").

9.      In addition, on September 11, 2019, the Honorable Sarah S. Vance, United States District Judge, Eastern District of Louisiana, issued an order under miscellaneous number 19-MC-12245 authorizing the interception of wire and electronic communications of a telephone assigned number (504) 228-8646 ("PRICE Telephone #1') and (504) 209-0051 ("PRICE

---

[1] MARTIN's Phone is subscribed to "Angela Lyons, 12530 Carmel Pl., New Orleans, Louisiana" and has been since December 3, 2013.  Queries of commercial databases, including Thomson Reuters CLEAR, indicate that MARTIN's Phone was listed in a credit application made in MARTIN's name.  In addition, the database revealed that MARTIN and Lyons reside together at 12530 Carmel Pl., New Orleans, Louisiana.  In addition, my team has observed MARTIN utilizing MARTIN's Phone while phone records indicated it was being used.  Finally, my team has intercepted the outgoing voicemail message of MARTIN's Phone, which states that the user is named "Sean."

[2] ESPRIT's Phone is subscribed to "Sean ESPRIT."  In addition, intercepted telephone calls over MARTIN's Phone have revealed that ESPRIT utilizes ESPRIT's Phone, as described later in this affidavit.

Telephone #2").  Interception over PRICE Telephone #1 and PRICE Telephone #2 began on September 11, 2019.  Interceptions over PRICE Telephone #2 terminated on September 23, 2019.  Interceptions over PRICE Telephone #1 terminated on October 10, 2019.  The user of PRICE Telephone #1 and PRICE Telephone #2 is PRICE ("PRICE"), one of MARTIN's associates.

*September 12-13, 2019 Transaction Involving LABRY, PRICE and MARTIN*

10.     Based on intercepted telephone calls, in conjunction with surveillance conducted via a pole camera, I believe that PRICE received a quantity of narcotics from LABRY on or about September 12, 2019.  In addition, I believe that PRICE acted as a middleman between LABRY and MARTIN, which ultimately resulted in MARTIN receiving a quantity of narcotics that originated from LABRY.  I also believe that ROBERTSON acted as a facilitator for this transaction, relaying messages between PRICE, MARTIN, and other of their associates.

11.     On September 12, 2019, at approximately 9:48 A.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing (504) 416-0006 ("LABRY's Phone") and said, "I see you." LABRY replied, "I didn't know you was in there, I thought you was gone." Geolocation information during this call indicated that PRICE was in the vicinity of Press Drive and Louisa St., New Orleans, LA.

12.     Based on this investigation, I believe that there exists a familial relationship between PRICE and LABRY. Moreover, an individual they commonly refer to as "mom" resides in close proximity to the aforementioned cell site information. As such, I believe that when PRICE said, "I see you," he had observed LABRY at the address of "mom" and that they then conducted a face to face meeting.  As described below, based on subsequent intercepted

telephone calls, I believe that PRICE received a quantity of narcotics, likely cocaine, from LABRY at that time.

13.     Later that day, at approximately 10:01 A.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from ROBERTSON, utilizing (504) 202-5098 ("ROBERTSON's Phone"). During this call PRICE said, "You talk to 'Young' yet?" and ROBERTSON replied that he had not.  PRICE then said, "You need to hit 'Young,' I just holler'd at Larry."  ROBERTSON said, "Oh yea?" to which PRICE replied, "Yea, I'll see you in a few minutes, I'm on my way to you now."  Geolocation information during this call indicated PRICE was at his residence, located at 5130 Baccich St., New Orleans, Louisiana ("PRICE's Residence") during this conversation.

14.     I know, based on my training and experience, that narcotics traffickers often use the phrase, "holler'd at" to denote meeting with another party to conduct narcotics related business. I believe that when PRICE said "I just holler'd at Larry," he indicated to ROBERTSON that he had just met with LABRY and obtained a quantity of narcotics.  Further, based on this investigation, I know that PRICE stores bulk narcotics at PRICE's Residence and maintains only a working inventory of narcotics when at ROBERTSON's Residence. Therefore, the fact that PRICE returned to PRICE's Residence briefly before traveling to meet ROBERTSON corroborates my belief that PRICE obtained a resupply of narcotics from LABRY.

15.     Based on pen register records, at approximately 10:02 A.M., ROBERTSON placed an outgoing call to MARTIN's Phone, utilized by MARTIN, which lasted approximately 42 seconds.  This was the first outgoing telephone call placed by ROBERTSON after the above-described conversation with PRICE.  Given the immediacy with which ROBERTSON placed an

outgoing call to MARTIN after speaking to PRICE, I believe that "Young" is a nickname PRICE and ROBERTSON use for MARTIN. Given the urgency of PRICE when he asked whether ROBERTON had spoken to "Young" and the context given when he reiterated, "You need to hit 'Young," I believe that MARTIN was a party to the narcotics transaction which had just taken place between PRICE and LABRY.  Specifically, I believe that during this telephone call at 10:02 A.M., ROBERTSON relayed the information that he received from PRICE during the 10:01 A.M. telephone call, described above, and asked MARTIN whether MARTIN had money necessary to purchase a quantity of narcotics from LABRY.

16.    On that same morning, my team conducted surveillance of ROBERTSON's Residence, via a pole camera. Later that day, at approximately 10:06 A.M., ROBERTSON arrived at ROBERTSON's Residence in his Ford pickup truck, at which time PRICE, utilizing PRICE Telephone #1, received an incoming call from ROBERTSON, utilizing ROBERTSON's Phone, who said, "As we speak."  PRICE replied, "I'm on my way to ya."  This was the first outgoing telephone call placed by ROBERTSON's Phone after the above-described 10:02 A.M. telephone call to MARTIN's Phone.

17.    Immediately after ending his call with ROBERTSON, PRICE, utilizing PRICE Telephone #1, placed an outgoing call to LABRY, utilizing LABRY's Phone, who said, "Yea big man." PRICE replied, "Yea he just called, I'm about to go meet him and come by you," and LABRY responded, "Alright, I'ma be out there."

18.    I believe that when ROBERTSON said, "as we speak," he was relaying to PRICE that he had just spoken to MARTIN (referring to the 10:02 A.M. telephone call described above) and that MARTIN had told ROBERTSON that he was on his way to meet ROBERTSON and PRICE.  I then, in turn, believe that when PRICE told LABRY, "Yea he just called, I'm about to

go meet him and come by you," PRICE informed LABRY that he had just spoken to ROBERTON and by extension, MARTIN, and that he would meet with them with regards to an ongoing narcotics transaction involving all of the aforementioned parties.

19.     Shortly after the end of PRICE and ROBERTSON's phone call, at approximately 10:08 A.M., utilizing the pole camera I conducted surveillance of ROBERTSON's Residence.  A Toyota sedan, Louisiana license plate 242AKJ (the "Toyota"), arrived at ROBERTSON's Residence at which time MARTIN exited the Toyota's rear passenger door. ROBERTSON and MARTIN conversed outside of ROBERTSON's Residence until PRICE arrived several minutes later in his Infiniti, at approximately 10:12 A.M.  Subsequently, I observed MARTIN to be utilizing a cellular telephone.   Telephone records for MARTIN's Phone indicated that MARTIN's Phone was active at that time, and therefore, I believe that MARTIN was the user of MARTIN's Phone.

20.     Subsequently, PRICE, MARTIN and ROBERTSON conversed for several minutes outside of ROBERTSON's Residence before MARTIN got into the rear of the vehicle he arrived in, which then departed.

21.     At approximately 11:12 A.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone.  PRICE stated, "I was waiting on him, I came and talked to him. He told me he about to go handle it. He told me to stay in the area, he was gonna call me in a few." LABRY replied, "cool, just call me (U/I)."  At approximately 11:31 A.M., pen register data showed a text message sent from ROBERTSON's Phone to MARTIN's Phone.  Pole camera surveillance showed that during this time, ROBERTSON and PRICE were together in front of ROBERTSON's Residence.  At approximately 11:36 A.M., ROBERTSON's Phone received an incoming text message from MARTIN's Phone.   Subsequently, at

approximately 11:39 A.M., ROBERTSON's Phone sent an outgoing text message to MARTIN's Phone. Subsequently, at approximately 11:39 A.M. ROBERTSON's Phone received an incoming text message from MARTIN's Phone.

22.     During the aforementioned call, I believe that when PRICE said, "I was waiting on him, I came and talked to him," he had informed LABRY that he had just met with MARTIN. Moreover, the visual surveillance of the aforementioned meeting between PRICE, MARTIN and ROBERTSON further confirmed my belief that the "him" referred to in this telephone call was MARTIN. Further, I believe that when PRICE stated, "He told me he about to go handle it. He told me to stay in the area, he was gonna call me in a few," he was explaining to LABRY that MARTIN had told him that he was in the process of collecting proceeds for a quantity of narcotics he had negotiated, through PRICE, to purchase form LABRY. In addition, I believe that PRICE was informing LABRY that MARTIN would obtain said funds shortly, at which time PRICE would deliver them to LABRY. Based on my training and experience, I know that it is common for narcotics supplies to arrange for trusted associates to utilize their "plug" or supplier, but only indirectly, as not to exclude themselves from leveling a "tax" on any transaction. "Taxing" a transaction refers to a narcotics trafficker taking a fee on a transaction they are party to, namely on one that their main role is connecting buyer and seller. Based on this investigation and others conducted by members of DEA New Orleans, I know that both LABRY and MARTIN are kilogram level cocaine and heroin distributors, a capacity that exceeds that of PRICE. Despite this, given PRICE's existing relationship with LABRY and his close association with MARTIN through ROBERTSON's Residence, PRICE is ideally positioned to profit from a recurring narcotics relationship between LABRY and MARTIN, with PRICE set to levy a "tax" on these dealings.

9

23.     PRICE and ROBERTSON continued to congregate near the stoop of the Residence and at approximately 11:31 A.M., ROBERTSON was observed utilizing his telephone.  As described above, pen registers active on ROBERTSON's Phone indicated that ROBERTSON and MARTIN, utilizing MARTIN's Phone, exchanged four SMS messages over the next nine minutes.

24.     At approximately 1:24 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, which went unanswered.

25.     Based upon this pattern of communications, I believe that after PRICE spoke with LABRY, ROBERTSON contacted MARTIN on MARTIN's Phone (during the above-described text message exchanges) in an effort to ascertain if he had acquired the proceeds PRICE was waiting to bring to LABRY.  As a result of what MARTIN told ROBERTSON, I believe that PRICE did not answer LABRY's call in an effort to afford MARTIN more time.

26.     At approximately 2:16 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, who said, "What it do, big man." PRICE replied, "Shit, i'm still waiting," and LABRY said, "Shit still down, huh?" PRICE responded, "I can't go nowhere, I have to...I aint got all night either," and went on to say he had to be at the airport early the next morning to pick up a family member. LABRY then said, "I'm waiting on you," and PRICE acknowledged before the call was terminated.

27.     During the aforementioned call, I believe that when PRICE said, "shit, i'm still waiting," and LABRY replied, "shit still down, huh?" they were referring to the fact that MARTIN had yet to provide PRICE with currency that he was to deliver to LABRY.

28.     After the aforementioned phone call, two of MARTIN's associates, Corey JULUKE ("JULUKE") and Ronald WILSON Jr. ("WILSON Jr.") departed ROBERTSON's

Residence in WILSON Jr.'s SUV, returning within a half hour.  After some time, WILSON Jr. retrieved a red plastic bag from his SUV, which he then took inside ROBERTSON's Residence. Shortly thereafter, WILSON Jr. departed in his vehicle.  He was not holding the red plastic bag.

29.     At approximately 4:06 P.M., PRICE, ROBERTSON and JULUKE exited ROBERTSON's Residence, at which time ROBERTSON was observed to be carrying the red plastic bag WILSON Jr. had previously brought into ROBERTSON's Residence.  The three then got into PRICE's Infiniti SUV and departed, with ROBERTSON in the driver's seat.

30.     At approximately 4:50 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, and said, "I'm still waiting man," and LABRY said, "That nigga ain't gonna always...shit."  PRICE replied, "He said he was waiting on the police, he had an accident in the rental," and LABRY responded, "alright, I'ma start moving around, I got to go, I cant sit that long" and PRICE replied "I'll fuck with you."

31.     With respect to the aforementioned call, I believe that when PRICE said, "I'm still waiting man," he was informing LABRY that he had yet to meet with MARTIN because MARTIN was involved in a traffic accident.

32.     Approximately a half hour after the aforementioned call, ROBERTSON and PRICE returned to ROBERTSON's Residence, at which time both men exited the vehicle and the aforementioned red plastic bag was not observed.

33.     The investigation has revealed that, WILSON Jr. often acts as a facilitator for JULUKE, as the latter attempts to insulate himself from directly handling narcotics and the proceeds derived from their trafficking.  Further, I know that narcotics traffickers will often utilize a third party to drive a vehicle when they are traveling with illicit substances or proceeds. As such, I believe that when JULUKE and WILSON Jr. returned to ROBERTSON's Residence,

they had just collected narcotics proceeds which were contained in the red plastic bag WILSON Jr. carried in ROBERTSON's Residence.  Further, when JULUKE, PRICE and ROBERTSON departed the Residence, ROBERTSON carried the red plastic bag on behalf of JULUKE and drove PRICE's vehicle such that JULUKE and PRICE had further deniability should they be stopped by law enforcement in transit to JULUKE's destination.

34.     The next day, on September 13, 2019, at approximately 7:49 A.M., PRICE, utilizing PRICE Telephone #1, placed an outgoing call to ROBERTSON, utilizing ROBERTSON's Phone. During this call, ROBERTSON, discussing his morning plans said, "I'ma try to get home to see with that, see if I get any phone calls."  I believe that during this call, when ROBERTSON referred to "phone calls," he was referring to the same calls LABRY and PRICE were waiting on from MARTIN.

35.     A pen register active on a telephone utilized by JULUKE, indicated that at approximately 8:05 A.M., JULUKE received an incoming call from MARTIN, utilizing MARTIN's Phone, which lasted approximately 12 seconds. Additionally, at approximately 8:19 A.M., JULUKE placed an outgoing call to MARTIN's Phone, utilized by MARTIN, which lasted approximately 25 seconds.  I believe that during these calls, JULUKE and MARTIN discussed the collection of proceeds owed to LABRY for narcotics.

36.     At approximately 8:38 A.M, ROBERTSON received an incoming call from MARTIN's Phone, utilized by MARTIN, which lasted approximately 29 seconds, followed by an outgoing call to MARTIN's Phone at approximately 8:41 A.M, which lasted approximately 36 seconds.  I believe that during these calls, MARTIN provided a status update on the money owed to LABRY to ROBERTSON.

37.     Over the course of one minute, beginning at approximately 9:25 A.M., JULUKE sent two and received one text message from MARTIN's Phone.  I believe that these text messages related to the earlier conversations between JULUKE and MARTIN, during which they discussed the collection of proceeds owed to LABRY for narcotics.

38.     On that same morning, my team conducted surveillance of ROBERTSON's Residence, via the aforementioned pole camera. At approximately 9:55 A.M., JULUKE arrived at the Residence in his BMW sedan and spoke to ROBERTSON. Several minutes later, JULUKE returned to his vehicle and departed.

39.     At approximately 10:11 A.M., PRICE, utilizing PRICE Telephone #1, placed an outgoing call to LABRY, utilizing LABRY's Phone, and briefly discussed their common family member, "moms."  After a short time, LABRY said, "You man a'int never called you, huh?" and PRICE stated, "Yup, he called me this morning. I told him i'ma wait until they come back, man. Because I'm going to be doing nothing but sitting. Yesterday what happened, he had a rental right, and he had be renting a rental but it was time to go back, so he had let someone take a ticket and hit him, for the insurance, he  was tired of waiting for the police."  PRICE continued, "But he called me, he called me about 7:30 this morning and said you can move now? and I told him man it's too late, I'll wait."

40.     I believe that when LABRY said, "you man a'int never called you, huh?" he was referring to MARTIN and inquiring as to whether he had contacted PRICE to let him know he had collected the requisite proceeds. As described above, prior to LABRY and PRICE's call and after ROBERTSON and PRICE's call, I believe JULUKE and MARTIN spoke with regards to collecting proceeds due to LABRY, some of which were contained in the red plastic bag observed on surveillance the day prior. MARTIN then contacted to ROBERTSON to give him a

status update. Being that this update occurred after PRICE and ROBERTSON spoke, I believe that PRICE took the liberty of explaining to LABRY that unforeseen circumstances involving MARTIN's rental car had preluded MARTIN from delivering the proceeds LABRY had expected form PRICE the day prior.

41.     I know, based on surveillance of ROBERTSON's Residence, that MARTIN, including on September 12, 2019, was driving a red Chevy Equinox, bearing Illinois license plate BF 88633.  An administrative subpoena issued to Avis for rental agreement information indicated it was rented by MARTIN and that it was due back on September 12, 2019.  I believe that this information, in conjunction with PRICE's conversation with LABRY, corroborates my belief that MARTIN was the individual PRICE and LABRY were ultimately referring to and further, that ROBERTSON was insulating LABRY and PRICE from direct telephonic with MARTIN to thwart law enforcement efforts to uncover their overall illicit operation.

42.     At approximately 10:34 A.M., JULUKE returned to the ROBERTSON's Residence in his BMW sedan and joined ROBERTSON on the stoop, before both entered ROBERTSON's Residence. Shortly thereafter, Robert JOHNSON ("JOHNSON"), another associate, arrived in Land Rover Discover, bearing LA Tag ZYH068, and entered ROBERTSON's Residence.  Soon after, a silver GMC SUV, bearing FL Tag GVUK53, arrived at the Residence, at which time MARTIN exited the vehicle with a white plastic bag and a small card board box and entered the Residence. Lastly and within minutes of MARTIN arriving, CHENEAU arrived at ROBERTSON's Residence and went inside.

43.     Within two minutes of MARTIN's arrival, he and JOHNSON emerged from ROBERTSON's Residence, at which time JOHNSON was observed to be carrying a white plastic bag. The two men then walked toward JOHNSON's vehicle, which he then departed in, at

14

which time MARTIN returned to ROBERTSON's Residence.  I believe that JOHNSON received a quantity of narcotics or narcotics proceeds from MARTIN at ROBERTSON's Residence, given the duration of their meeting and the pattern of activity my team has observed at ROBERTSON's Residence for several months.

44.     At approximately 11:23 A.M., MARTIN exited ROBERTSON's Residence empty handed and departed in his vehicle. JULUKE also left the area several minutes later.

45.     Later that day, on September 13, 2019, at approximately 3:03 P.M., PRICE, utilizing PRICE Telephone #2, placed an outgoing call to a telephone assigned number (504) 610-0353, utilized by an unidentified male who goes by the name "Terry" ("Terry LNU"). During this call, PRICE and Terry LNU did not initially recognize each other. After identifying one another, PRICE said, "Shit I was hollering at, you know, letting you know everything was love," and "I hit you earlier." Indeed, the day prior, at approximately 12:41 P.M., PRICE, utilizing PRICE Telephone #2, placed an outgoing call to Terry LNU which went unanswered. PRICE went on to say, "I aint heard from you in so long and what happened, me and brother was by the house today, once everything got alright I said let me let everybody know. I was going through the phone and I seen your number and I hit ya," and "and I mean this nice too."  Terry LNU and PRICE then arranged to speak later and arrange a transaction.

46.     During the aforementioned conversation, I believe that when PRICE said that he was, "letting you know everything was love," he was informing Terry LNU that the narcotics he had obtained from LABRY on the morning of September 12th was of high quality, a fact he later reiterated when he said, " and I mean this nice too."  Further, I believe that when PRICE referred to "brother," he was referring to LABRY and "the house" in this context referred to "moms" house, which I believe to be a common family member of LABRY and PRICE.  I believe that

when PRICE stated that he met with "brother" "today," he was actually referring to the meeting with LABRY the day before, when he had first called Terry LNU, but the call was not answered. Therefore, this telephone call further corroborates my belief that PRICE obtained a quantity of narcotics from LABRY during that September 12, 2019 meeting.

*September 24, 2019 Transaction Involving PRICE, LABRY and MARTIN*

47.    Based on intercepted calls, I believe that PRICE arranged to receive another quantity of narcotics from LABRY on behalf of MARTIN on or about September 24, 2019.  As with the prior transaction, I believe that ROBERTSON served as a messaging conduit between PRICE and MARTIN pertaining to this transaction.

48.    On September 24, 2019, at approximately 4:54 P.M., ROBERTSON received an incoming call from MARTIN, utilizing MARTIN's Phone, which lasted approximately 1 minute and 44 seconds.  On that same evening, my team conducted surveillance of ROBERTSON's Residence, via the aforementioned pole camera. At approximately 5:18 P.M, a brown Chevy truck, bearing LA Tag Y179470, registered to Sean MARTIN, arrived at the Residence. MARTIN then exited the vehicle carrying a bag over his shoulder and entered ROBERTSON's Residence.

49.    Approximately 4 minutes after MARTIN arrived, at approximately 5:22 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from ROBERTSON, who said, "I need to see you brah," and "today." PRICE said, "Alright, I'll be right down." ROBERTSON's communication with PRICE was his next communication after his call with MARTIN.

50.      I believe that during the aforementioned call, ROBERTSON was conveying to PRICE that MARTIN was at ROBERTSON's Residence and that PRICE needed to come there to discuss narcotics related business in person.

51.      At approximately 5:37 P.M., PRICE arrived at ROBERTSON's Residence in his Infiniti sedan and went inside.  At approximately 5:45 P.M., MARTIN exited ROBERTSON's Residence with a bag over his shoulder and departed in his vehicle, followed by PRICE, approximately five minutes later.

52.      At approximately 6:06 P.M., PRICE, utilizing PRICE Telephone #1, placed another outgoing call to LABRY, utilizing LABRY's Phone, which went unanswered.  PRICE's call to LABRY was his first call on PRICE Telephone #1 or PRICE Telephone #2 after departing ROBERTSON's Residence.  Shortly thereafter, PRICE, utilizing PRICE Telephone #1, placed another outgoing call to LABRY, utilizing LABRY's Phone.  During that call, LABRY asked, "you alright?" and PRICE said, "yea, yea, yea."  LABRY said, "call you later."

53.      At approximately 6:45 P.M., PRICE, utilizing PRICE Telephone #1, received an incoming call from LABRY, utilizing LABRY's Phone, who said, "been alright?"   PRICE responded, "Yea," and LABRY said, "I was asking cause them boys came back in town." PRICE replied, "Uh-huh." After discussing a car briefly, PRICE said, "He had called me ya know. I told him hold on, so I could talk to my podner, I was making sure you straight." LABRY said, "The man hungry, I appreciate though." PRICE then said, "C'mon man, this me and you. Alright, I'll be around if you need me, call me," and LABRY said, "Alright, I'll fuck with you."

54.      During the aforementioned call, I believe that when LABRY said, "I was asking cause them boys came back in town," LABRY was conveying to PRICE that his narcotics

supplier had delivered additional narcotics and that when LABRY asked, "been alright," he was referring to PRICE's narcotics related business. Further, when PRICE said, "He had called me ya know. I told him hold on, so I could talk to my podner, I was making sure you straight," he was referring to the call he had received from ROBERTSON, which I believe was on behalf of MARTIN, which led to PRICE meeting ROBERTSON and MARTIN at ROBERTSON's Residence.  During the aforementioned meeting, I believe that the bag MARTIN brought to and from the Residence contained drug proceeds.  As such, I believe PRICE was informing LABRY that he had told MARTIN to slow his efforts to obtain a quantity of narcotics from LABRY until PRICE ensured that LABRY would be able to supply the agreed upon quantity.  Moreover, I believe that LABRY's response, "The man hungry, I appreciate though" is a reference to his appreciation of MARTIN's eagerness to conduct their agreed upon transaction.

*Seizure of Drug Proceeds on November 1, 2019*

55.     On or about November 1, 2019, DEA intercepted a telephone call between MARTIN and a then-unidentified male, later identified as Marvin COLLINS ("COLLINS"). During that telephone call, MARTIN and COLLINS arranged to meet at the Home Depot located in New Orleans East.  Later that day, agents observed MARTIN arrive at the Home Depot driven by an unidentified male.  Agents observed MARTIN enter COLLINS's vehicle, where he remained for less than two minutes.

56.     Subsequently, agents conducted a vehicle stop of COLLINS's vehicle and searched the vehicle.   Inside, agents seized approximately $15,000 of U.S. currency. Approximately $10,000 was in one bundle labeled "10" and the approximately remaining $5,000 was in a bundle labeled "5."  Additionally, agents located COLLINS's Device in the front center console of his vehicle.

57.     COLLINS was provided with Miranda warnings and was questioned about the money.  COLLINS stated, in sum and substance, that he was on the way downtown to pick up his wife, and initially denied making any stops on the way.  COLLINS later said that he stopped at a grocery store.  COLLINS's statement was inconsistent with the surveillance conducted on that day.  After confronted with the fact that he was observed at Home Depot, COLLINS stated that he met with his cousin at that location, named John Williams, but was unable to provide many specific details regarding this individual.  In any event, this statement was also inconsistent with the aforementioned surveillance.

58.     Based on my training and experience, as well as the investigation generally, I believe that MARTIN provided COLLINS with the aforementioned $15,000 as a payment for narcotics that COLLINS previously provided to MARTIN.  Moreover, I believe that COLLINS utilized COLLINS's Device to arrange to meet MARTIN and that it is likely COLLINS utilized said device to arrange similar narcotics related meetings in the past.

59.     I believe, based on this investigation, that COLLINS utilizes cellular telephones to conduct his narcotics trafficking activities, and therefore, I believe it is likely that evidence of prior narcotics transactions, including transactions with MARTIN, are likely to be found on the COLLINS Device.

60.     After COLLINS's Device was seized on November 1, 2019, my team kept custody of COLLINS's Device and secured it as evidence in a secured area at the DEA, where it has remained in storage.  In my training and experience, I know that COLLINS's Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when COLLINS's Device first came into the possession of the DEA.

*MARTIN Sold Heroin on November 12, 2019*

61.    Intercepted telephone calls involving MARTIN revealed that on or about November 12, 2019, MARTIN utilized 3443 Esplanade Ave., Apartment 147, New Orleans, Louisiana ("ESPRIT's Residence")[3]  to store heroin that he subsequently provided to a customer. For example, on November 12, 2019, at approximately 1:36 P.M., MARTIN, utilizing MARTIN's Phone placed an outgoing call to ESPRIT, utilizing ESPRIT's Phone, and said, "Where you at?"  ESPRIT replied, "I'm inside."  During this call, I believe ESPRIT informed MARTIN that he was at the Target Residence.

62.    Later that day, at approximately 2:07 P.M., MARTIN, utilizing MARTIN's Phone, had a conversation with a telephone assigned number (504) 357-8084 ("PERKINS's Phone"), utilized by Odell PERKINS.  Technical issues precluded agents from determining the direction of this call.  During this call, PERKINS said, "Right there off Esplanade, by big boy," and MARTIN said, "huh."  PERKINS responded, "By brother," to which MARTIN said, "Alright."

63.    I know, based on this investigation, that members of MARTIN's organization utilize 1330 Kerlerec St., New Orleans, LA ("1330 Kerlerec") as a meeting location.  Further, I know that 1330 Kerlerec is in close proximity to Esplanade Ave. and that "big boy," refers to Corey JULUKE, a coconspirator of MARTIN whom spends the majority of his day at 1330 Kerlerec. Via a pole camera showing the vicinity of 1330 Kerlerec, I observed MARTIN to be at 1330 Kerlerec St. at the time of the aforementioned call, a fact confirmed by geolocation data

---

[3] ESPRIT's Residence is located inside an apartment complex called "the Esplanade at City Park."  Records provided by the management of the apartment complex, including the rent roll information, revealed that ESPRIT resides at ESPRIT's Residence.

associated with MARTIN's Phone.  As such, I believe that PERKINS and MARTIN arranged to meet at 1330 Kerlerec St.

64.     At approximately 2:21 P.M., ESPRIT, utilizing ESPRIT's Phone placed an outgoing telephone call to MARTIN, utilizing MARTIN's Phone, during which ESPRIT said, "Where you at because I'm about to make a move?"  MARTIN said, "Where you going?" to which ESPRIT replied, "[unintelligible] about to come slide on me."  MARTIN said, "You sound like you're in the car already," and ESPRIT then clarified that he was watching YouTube. MARTIN then said, "I was just waiting on [unintelligible] and I'm about to pull out," and ESPRIT asked, "are you by Unk?"  MARTIN replied that he was, and ESPRIT said he would be at that location in due time.

65.     During this call, I believe that when ESPRIT said that he was, "about to make a move" and that, "[unintelligible] about to slide on me," ESPRIT was informing MARTIN that he would be leaving ESPRIT's Residence shortly to deliver narcotics to an unknown person.  I know, based on my experience, that narcotics traffickers often use vague terms like, "make a move" to denote an impending narcotics transaction and "slide on me" to indicate that an individual was coming to meet with them.

66.     At approximately 2:24 P.M., MARTIN, utilizing MARTIN's Phone placed an outgoing call to PERKINS Phone, which was answered by an unidentified female ("UF-1"). MARTIN said, "Hey sis, he left yet?" UF-1 responded that "he" had departed and MARTIN said, "Alright." I believe that MARTIN placed this call to ascertain whether PERKINS had departed his residence to meet him at 1330 Kerlerec St. and learned that PERKINS had left his phone behind.

67.     At approximately 3:20 P.M., PERKINS was observed, via pole camera, arriving at 1330 Kerlerec St. on foot.  At approximately 3:24 P.M., MARTIN departed 1330 Kerlerec St., in his Chevy Truck.  I believe that at that time, MARTIN and PERKINS discussed, in person, the impending drug transaction that was alluded to over the above-described intercepted telephone calls.

68.     At approximately 3:21 P.M., MARTIN received an incoming call from a telephone assigned number (504) 628-6609, utilized by an unknown female ("UF-2") who asked what MARTIN was doing. MARTIN replied, "I was waiting to holla at my little partner," and then he would be on his way to meet UF-2.  I know that "holla at" is common used by narcotics traffickers to indicate a narcotics transaction and that "partner" is used to refer to an individual's counterparty, who in this instance, is PERKINS.

69.     A review of surveillance footage from a camera facing ESPRIT's Residence and the rear entrance of the building revealed that ESPRIT and an additional male ("UM-1") departed ESPRIT's Residence at approximately 3:28 P.M.

70.     At approximately 3:34 P.M., MARTIN was observed, via surveillance camera, entering The Esplanade at City Park via its rear entrance and at which time he proceeded to enter ESPRIT's Residence by himself. Additionally, geolocation information associated with MARTIN's Phone indicated that it was in close proximity to ESPRIT's Residence.

71.     At approximately 3:44 P.M., MARTIN was observed, via surveillance camera, departing ESPRIT's Residence by himself and exiting though the rear entrance.

72.     Shortly thereafter, MARTIN's vehicle arrived back at 1330 Kerlerec St., at which time PERKINS got into its front passenger seat before it departed. My team conducted surveillance of MARTIN and PERKINS as they traveled near 2015 Magic St., New Orleans, LA,

the last known address of PERKINS. My team was unable to see PERKINS depart MARTIN's vehicle but shortly thereafter observed MARTIN driving his vehicle alone.

73.     Based on the intercepted telephone calls described above, as well as my training and experience, I believe that MARTIN obtained a quantity of heroin from ESPRIT's Residence, which he then provided to PERKINS in MARTIN's vehicle in the vicinity of 1330 Kerelec St.

*MARTIN provided heroin to JACKSON on November 13, 2019*

74.     On November 13, 2019, at approximately 12:18 P.M., MARTIN, utilizing MARTIN's Phone placed an outgoing call to a telephone assigned number (504) 621-7577 ("JACKSON's Phone"), utilized by Gene JACKSON and said, "I'm on my way down, where you at with it?" JACKSON replied, "I am downtown." MARTIN went on to say, "Alright, what time is you going to be free?" and JACKSON replied, "I'm free right now, where you at?" MARTIN said, "At my moms," and JACKSON said, "alright, I'm about to pass that way."

75.     During the aforementioned call, I believe that that MARTIN and JACKSON made arrangements to meet imminently at "mom's" to conduct a narcotics transaction. I know, based on my training and experience, that it is common for narcotics traffickers to utilize vague terms such as "it" or "thing" to refer to narcotics and/or narcotics transactions.  Therefore, I believe that when MARTIN asked JACKSON "where you at with it?" he was asking whether JACKSON was prepared to purchase heroin from MARTIN.  Further, based on this investigation, I believe that "mom's refers to 919 N. Claiborne Ave., New Orleans, LA, which is a bar/louge named "Jackie's Touch of Class," utilized by members of the organization as a meeting location ("Jackie's").

76.     At approximately 12:20 P.M., my team located MARTIN's Chevy Truck parked near the rear entrance of The Esplanade at City Park, an apartment complex located at 3443

Esplanade Ave., New Orleans, Louisiana.  At approximately 12:26 P.M. MARTIN exited the rear entrance and departed in his Chevy Truck. A review of surveillance camera footage revealed that during this time, MARTIN entered the Apartment 147 for a short time before he departed and was subsequently observed by my team.

77.     I believe that MARTIN told JACKSON that he was at "Mom's" when he was in fact at the Esplanade at City Park because narcotics traffickers are reluctant to reveal the location of their "stash spot," given the value of narcotics stored there and the inability to seek legal remedy should they be stolen.  As such, I believe that once MARTIN had determined JACKSON was ready to conduct their transaction, he traveled briefly to the Esplanade at City Park to obtain narcotics he would give to JACKSON, thus minimizing the time MARTIN would the narcotics on his person and in turn minimizing MARTIN's risk of being caught with them.

78.     Surveillance was conducted as MARTIN traveled to Jackie's and parked in its front parking area. A tan Dodge Truck, bearing LA Tag Y164538, was observed parked in front of said location on the street and upon MARTIN's arrival, an individual later identified as Gene JACKSON emerged from the driver's seat of the Dodge Truck and got into the passenger's seat MARTIN's Chevy Truck. The aforementioned Dodge Truck is registered to JACKSON.

79.     After meeting briefly in MARTIN's Chevy Truck, JACKSON departed in his Dodge Truck. I believe that during this meeting, MARTIN provided JACKSON with a quantity of heroin.

80.     My team conducted surveillance of JACKSON as he traveled to the Westbank of New Orleans, at which time they conducted a vehicle stop of JACKSON. JACKSON was detained and a search of his Dodge Truck was conducted, resulting in the seizure of approximately 58 grams of a substance which field tested positive for heroin.  In addition,

members of the investigative team seized JACKSON's Device #1 and JACKSON's Device #2 from the Dodge Truck. JACKSON was provided with Miranda warnings and interviewed, although he stated that he had been downtown working and hadn't met with any individuals prior to the traffic stop. JACKSON was unwilling to provide any further information and was released in furtherance of this investigation. JACKSON's statement was inconsistent with the aforementioned surveillance conducted of JACKSON meeting with MARTIN.

81.     I believe, based on this investigation, that JACKSON utilizes cellular telephones to conduct his narcotics trafficking activities, and therefore, I believe it is likely that evidence of prior narcotics transactions, including transactions with MARTIN, are likely to be found on the JACKSON's Device #1 and JACKSON's Device #2.

82.     After JACKSON's Device #1 and JACKSON's Device #2 were seized on November 13, 2019, my team kept custody of JACKSON's Device #1 and JACKSON's Device #2 and secured them as evidence in a secured area at the DEA, where they have remained in storage. In my training and experience, I know that JACKSON's Device #1 and JACKSON's Device #2 have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the DEA.

*Federal Search Warrant conducted at ESPRIT's Residence on November 19, 2019*

83.     On November 18, 2019, the Honorable Janis van Meerveld, United States Magistrate Judge, Eastern District of Louisiana, signed a federal search warrant authorizing the surreptitious search of Apartment 147 at the Esplanade at City Park, 3443 Esplanade Ave., New Orleans, Louisiana. My team executed the aforementioned warrant on November 19, 2019 and seized approximately 1.5 kilograms of suspected heroin, a loaded handgun, $2,000, and drug

distribution paraphernalia. Lastly, my team seized ESPRIT's Device #1 and ESPRIT's Device #2 from inside the apartment.

84.     I believe, based on this investigation, that ESPRIT utilizes cellular telephones to conduct his narcotics trafficking activities, and therefore, I believe it is likely that evidence of prior narcotics transactions, including transactions with MARTIN, are likely to be found on the ESPRIT's Devices.   In my training and experience, I know that ESPRIT's Device #1 and ESPRIT's Device #2 have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the DEA.

## TECHNICAL TERMS

85.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved
in such navigation.  The Global Positioning System (generally abbreviated
"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite
contains an extremely accurate clock.  Each satellite repeatedly transmits by radio
a mathematical representation of the current time, combined with a special
sequence of numbers.  These signals are sent by radio, using specifications that
are publicly available.  A GPS antenna on Earth can receive those signals.  When
a GPS antenna receives signals from at least four satellites, a computer connected
to that antenna can mathematically calculate the antenna's latitude, longitude, and
sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used
for storing data (such as names, addresses, appointments or notes) and utilizing
computer programs.  Some PDAs also function as wireless communication
devices and are used to access the Internet and send and receive e-mail.  PDAs
usually include a memory card or other removable storage media for storing data
and a keyboard and/or touch screen for entering data.  Removable storage media
include various types of flash memory cards or miniature hard drives.  This
removable storage media can store any digital data.  Most PDAs run computer
software, giving them many of the same capabilities as personal computers.  For
example, PDA users can work with word-processing documents, spreadsheets,

28

and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

86.  Based on my training, experience, and research, I know that the Target Devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, or PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

87.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

88.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file)

b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

89. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

90. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

91.     I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Target Devices described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

*/s/ Ryan Schumacher*
Ryan Schumacher, Special Agent
Drug Enforcement Administration


Pursuant to Federal Rules of Criminal Procedure 4.1 and 41 (d)(3), the undersigned judicial

officer has on this date considered the information communicated by reliable electronic means in

considering whether a complaint, warrant, or summons will issue. In doing so, I have placed the

affiant under oath, and the affiant has confirmed that the signatures on the complaint, warrant, or

summons and affidavit are those of the affiant, that the document received by me is a correct and

complete copy of the document submitted by the affiant, and that the information contained in the

complaint, warrant, or summons and affidavit is true and correct to the best of the affiant's

knowledge.

Subscribed and sworn to before me on this  19th
of December, 2019, at 4:00 p.m.


HONORABLE JANIS VAN MEERVELD
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

92.     The property to be searched is:

   a.  One Samsung cellular phone, DEA Case GH-19-0017, Exhibit N-7 ("COLLINS's Device");

   b.  One black TCL cellular phone, DEA Case GH-19-0017, Exhibit N-12 ("JACKSON's Device #1);

   c.  One black Apple iPhone, DEA Case GH-19-0017, Exhibit N-13 ("JACKSON's Device #2");

   d.  One black Coolpad cellular phone, DEA Case GH-19-0017, Exhibit N-17 ("ESPRIT's Device #1"); and

   e.  One black Apple iPhone, DEA Case GH-19-0017, Exhibit N-18 ("ESPRIT's Device #2") (collectively, the "Target Devices")

The Target Devices are currently located at 3838 Causeway Blvd, Metairie, Louisiana.

   This warrant authorizes the forensic examination of the Target Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of

21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 924(c) and involve MARTIN, ESPRIT,

COLLINS, JACKSON, and others known and unknown since December 9, 2014, including:

      a.   lists of customers and related identifying information;

      b.   types, amounts, and prices of drugs trafficked as well as dates, places, and
         amounts of specific transactions;

      c.   any information related to sources of drugs (including names, addresses, phone
         numbers, or any other identifying information);

      d.   any information recording MARTIN, ESPRIT, COLLINS, or JACKSON's
         schedule or travel from December 9, 2014 to the present;

      e.   all bank records, checks, credit card bills, account information, and other financial
         records.

2.      Evidence of user attribution showing who used or owned the Target Devices at

the time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history;

      As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.